**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BLUE STAR EQUITY HOLDINGS, LLC AND MAGDY F. MAHMOUD,<br><br>  *Plaintiffs-Counterclaim Defendants,*<br> v.<br><br>ALL MEDICAL MANAGEMENT, LLC; BLUE STAR URGENT CARE, LLC; YEHUDA FINK; JOHN DOE (1-100); AND XYZ CORP. (1-100),<br><br>  *Defendants-Counterclaim Plaintiffs.* | Civil Action No. 22-5215 (KSH) (LDW)<br><br><br>**OPINION** |

**Katharine S. Hayden, U.S.D.J.**

  This case arose from a 2021 business deal that quickly went bad, prompting the filing of this action in 2022. In 2024, after plaintiffs Blue Star Equity Holdings, LLC ("Blue Star Equity") and Magdy Mahmoud ("Mahmoud") stopped prosecuting their claims, and more generally ceased participating in this case altogether, their affirmative claims were dismissed by report and recommendation adopted by this Court. (D.E. 40, 41.) Defendants All Medical Management, LLC ("AMM"), Yehuda Fink ("Fink"), and Blue Star Urgent Care, LLC ("Urgent Care"), who had asserted counterclaims against plaintiffs, then sought default judgment on those counterclaims. (D.E. 47.)

  On September 15, 2025, this Court granted defendants' motion in part and denied it in part. (D.E. 49, 50.) AMM, and only AMM, had established Blue Star Equity's liability for breach of contract as alleged in counts I and II of the counterclaim. AMM had not, however, established its entitlement to the damages it sought on those claims, which had to be proven, not merely pleaded. *PPG Indus. Inc v. Jiangsu Tie Mao Glass Co. Ltd*, 47 F.4th 156, 161 (3d Cir. 2022); *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 535-36 (D.N.J. 2008) (Kugler, J.).

1

AMM also failed to establish Mahmoud's liability on a veil-piercing theory, the subject of count V, and sought attorneys' fees without offering analysis, an amount, or factual support. No relief was sought on the remaining counts, which were therefore dismissed. AMM was afforded an opportunity to file a supplemental submission to cure the deficiencies the Court had identified. In response, it offered a certification signed by defendant-counterclaim plaintiff Fink. (D.E. 53, Supplemental Certification of Yehuda Fink ("Fink Supp. Cert.").)

On Count I of the counterclaim, which is AMM's claim for breach of the Agreement's non-compete provision, Fink's certification avers that on the opening of the competing facility in April 2022, AMM's facility "suffered an immediate decline in patient volume which continued for the duration of the non-compete period." (Fink Supp. Cert. ¶ 8.) He quantifies it as follows:

> 9. According to the business records, between the months of January 1, 2022, through December 30, 2022, the facility had an approximate average of 641 patients per month.
>
> 10. Thereafter, from May 1, 2022, to July 21, 2024, the facility had an approximate average of 290 patients per month, resulting in an approximate 351 patient visit per month loss.

(*Id.* ¶¶ 9-10.) Fink further avers that AMM had $1.11 million in "actual revenue losses" plus a "$1.29 million loss resale value of the facility." (*Id.* ¶ 11.) These numbers add up to $2.4 million, the amount sought in the counterclaim pleading and described therein as reflecting, for "reduced patient flow," $100,000 per month for the two-year period of the contractual noncompete period. (D.E. 2, Defts.' Ans. & Counterclaims, at 38 ¶ 38, 42 ¶ 64.) "On information and belief," Fink's certification continues, the reduced patient volume and decreased revenue were caused by Mahmoud's competing facility and activities, but this asserted causal connection between breach and asserted damages could not be "verif[ied]" due to plaintiffs' default in this case and their failure to engage in discovery. (Fink Supp. Cert. ¶¶ 12-13.)

This thin showing does not establish that AMM is entitled to the amount of damages it seeks. Even if a 351-patient/month reduction in volume is accepted as an appropriate delta—despite, puzzlingly, being based on two periods that overlap for six months—there is no effort made to connect how that that patient reduction translates to the $1.1 million in alleged "actual revenue losses." No further explanation or documentation is provided. That plaintiffs failed to engage in or produce discovery does not explain away this deficiency. AMM is comparing its own revenue before and after the opening of the competing facility, beginning six months after the closing that resulted in AMM's ownership of Urgent Care; the data about that is in its possession. As for the purported "los[t] resale value of the facility," which Fink says is $1.29 million, that number is not tethered to anything, and the Court observes that AMM bought Urgent Care just several years earlier for $600,000—less than half of the "los[t] resale value" it now claims. (D.E. 2, Defts. Ans. & Counterclaims, Ex. A.) AMM has been afforded several opportunities to back up its damages claim on this count, and as discussed in the Court's September 15, 2025 opinion, missed several deadlines. Only after the Court issued an order warning that the counterclaims would be dismissed did it file its default judgment motion. (D.E. 49, at 4.) No further opportunity will be afforded, *see Malik v. Hannah*, 661 F. Supp. 2d 485, 494 (D.N.J. 2009) (Simandle, J.), and no damages are awarded on count I.

With respect to Count II, the breaches of AMM's contract with Blue Star Equity were that (i) the latter had contractually represented that a particular lease agreement for the premises was in force, but it was not; a different lease agreement, requiring AMM to pay higher rent, was actually in force; and (ii) Blue Star Equity also contractually represented that payor contracts with Amerigroup Medicaid HMO, Amerigroup Medicare Advantage, and Wellcare were in effect, but in fact they were not.

As to the lease agreement, Fink's supplemental certification attaches as Exhibit A the lease AMM thought it was getting, which reflects monthly rent of $3,100, and as Exhibit B what Fink asserts is the actual lease, with rent beginning at $4,000 monthly for an initial five year term ending September 30, 2024, and increasing over four optional renewal terms running through 2049. Fink calculates the rent differential as adding up to $413,919 beginning one month into the initial term and concluding at the end of the final option period. (Fink Supp. Cert. ¶ 24.) This amount reflects the monthly rent reflected in what AMM has presented as the actual lease agreement. As the breaching party, it was up to Blue Star Equity to rebut this figure by showing, for example, that AMM has not mitigated damages, or that another defense or affirmative defense applies. *See, e.g.*, *Sean Wood, L.L.C. v. Hegarty Grp., Inc.*, 422 N.J. Super. 500, 520 (App. Div. 2011) ("The party breaching the contract bears the burden of proving the absence of mitigation."). Being in default, it failed to do so. The amount AMM seeks for this breach will be awarded.

As for the three payors for which there was no agreement, Fink avers that 286 patients who visited the facility had either Amerigroup Medicaid HMO or Amerigroup Medicare Advantage, and that if the facility was under contract with those payors as Blue Star Equity had represented, the facility would have been paid at least $75 per visit but was not paid anything. For Wellcare, there were 224 visits that would have been paid at $150 per visit. For both groups of visits, Fink states that "AMM was unable to obtain payment for the services rendered." (Fink Supp. Cert. ¶ 30.) These fees, which AMM lost out on due to Blue Star Equity's breach of contract, total $55,050.00,[1] which will be awarded.

---

[1] For the Amerigroup visits, Fink states that Medicaid HMO rate was $75/visit, and the Medicare Advantage rate was $110/visit. The calculation he provides only uses the $75, suggesting that the facility's records may not be able to distinguish between the types, leading AMM to seek the

4

As pleaded, count V sought to hold Mahmoud liable for the losses inflicted on AMM by Blue Star Equity because he allegedly operated Blue Star Equity such that it was an alter ego of himself.  (D.E. 2, Defts.' Ans. & Counterclaims, at 44 ¶¶ 91-95.)  As the Court observed in its September 15, 2025 opinion, the veil-piercing inquiry is a fact-specific one, and AMM had offered no facts, only conclusory legal assertions.  (D.E. 49, at 9.)

The supplemental certification does not cure that problem.  Veil-piercing analysis asks whether (1) there is "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist," and (2) "the circumstances . . . indicate that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice."  *HealthMax Med. Tech. Ltd. v. All Am. Health LLC*, 2024 WL 3666049, at *9 (D.N.J. Aug. 6, 2024) (Kirsch, J.) (cleaned up).  The first step looks at how the allegedly dominating entity or individual treated the supposed alter ego, including whether corporate formalities were observed, whether the allegedly dominated entity was grossly undercapitalized, how corporate records were (or were not) kept, and whether the entity's funds were siphoned off, among other things.  *Id.*; *see also Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 387 N.J. Super. 160, 200 (App. Div. 2006) ("In determining corporate dominance, courts engage in a fact-specific inquiry considering whether the subsidiary was grossly undercapitalized, the day-to-day involvement of the parent's directors, officers and personnel, and whether the subsidiary fails to observe corporate formalities, pays no dividends, is insolvent, lacks corporate records, or is merely a facade.").

---

lower figure for all.  (Fink Supp. Cert. ¶¶ 26, 30.)  Following AMM's lead, the Court's award includes $75 for each of the 286 visits, but that equals $21,450, not the $20,100 in paragraph 30 of the certification.

All Fink's certification offers is that (a) "Mahmoud executed the Agreement on behalf of Blue Star [Equity]," and (b) "According to information and belief, Mahmoud dissolved and/or liquidated all assets of Blue Star [Equity] to intentionally make the company judgment proof and avoid monetary liability by transferring the assets to himself and other entities owned by him for his sole benefit." (Fink Supp. Cert. ¶¶ 31, 36.)[2] Merely signing an agreement does not lead to the conclusion that Mahmoud dominated Blue Star Equity, and Fink asserts Mahmoud liquidated or dissolved the company or transferred assets based only on "information and belief." This begs the questions: When was this liquidation or dissolution done? What other entities did Mahmoud control that he transferred the assets to? Plaintiffs' refusal to participate in discovery reduced AMM's chances of getting detailed answers to every question, but AMM still must provide the factual basis for the assertions it *has* made. In *HealthMax*, for example, a plaintiff seeking default judgment on a veil-piercing claim relied on public court filings to show how a defendant's actions and their timing permitted a conclusion that the corporate form was a sham. 2024 WL 3666049, at *10. AMM has failed to support the first part of the veil-piercing test. And without that, the second part of the analysis—whether continuing to recognize Mahmoud and Blue Star Equity as separate from each other would "sanction a fraud or promote injustice"—isn't met. Accordingly, judgment is denied on Count V of the counterclaim.

---

[2] The certification's heading in this section also references Count IV of the counterclaim, which asserted a claim against Blue Star Equity for breach of the implied covenant of good faith and fair dealing. Count IV was already dismissed and, any event, cannot be a basis for recovery alongside AMM's successful breach of contract claims for the same conduct by Blue Star Equity. *HealthMax*, 2024 WL 3666049, at *8. The certification's section on Count V also includes several paragraphs (¶¶ 32-35) that don't relate to how Mahmoud operated Blue Star Equity, but to his own individual conduct in relation to AMM. AMM did not seek judgment on the torts it alleged directly against Mahmoud (Counts VI, VII, and VIII), and they were previously dismissed.

      AMM is entitled to $468,969.00 from Blue Star Equity for its breaches of contract as set forth in Count II of the counterclaim.  No further relief is awarded on the remainder of the counts.  AMM shall submit a proposed form of judgment within 7 days.  An appropriate order will enter.

Date: December 15, 2025

                                                                s/ Katharine S. Hayden
                                                               Katharine S. Hayden, U.S.D.J.